RECEIVED

SEP - 8 2005

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
MONROE LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| KELLY BECKHAM | CIVIL ACTION NO. 3:03-2334 |
| VERSUS | JUDGE ROBERT G. JAMES |
| CONSTRUCTION MATERIALS INC. | MAG. JUDGE JAMES D. KIRK |

### RULING

Plaintiff Kelly Beckham ("Beckham") brought this lawsuit against her former employer, Construction Materials Inc. ("CMI"), alleging sexual harassment, gender discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.* Pending before the Court is a Motion for Summary Judgment filed by CMI [Doc. No. 31].

For the following reasons, CMI's Motion for Summary Judgment is GRANTED.

### I. FACTS AND PROCEDURAL HISTORY

CMI is a supplier of concrete-related products for the construction industry and has several branches located in Louisiana and Texas, as well as other states.

In April 2000, Beckham applied for a sales position with CMI's West Monroe branch. During the application process, Beckham informed CMI management that she was pregnant and would deliver her child in November 2000.

CMI hired Beckham for an inside sales position, and on May 1, 2000, she began her employment. Beckham was provided a copy of CMI's Employee Handbook, which contains its Harassment Policy prohibiting sexual harassment and identifying complaint procedures. Pursuant to the Harassment Policy, employees are instructed to report harassment by using "the 'Open Door

Policy' or any other avenue of communication to voice concerns to [his or her] supervisor, the Human Resources Manager or any other manager."

Because of the heat during the summer and the need for construction customers to be at their job sites in the morning, CMI begins receiving calls and meeting with customers by 6:30 A.M. In fact, customers are often waiting for the office to open at that time. The West Monroe branch was a small office, staffed only by Beckham; John Price, manager; Randy Guy, outside sales; John Carlson, inside sales; and Ezekial Holland, driver. All employees were required to begin work at 6:30 A.M. Beckham was informed when she was hired that she would have a 45-hour work week with a 6:30 A.M. to 5:00 P.M. schedule.

After the birth of her child in November 2000, CMI granted Beckham a three-month paid leave of absence. No other employee, male or female, had ever been given a paid leave of absence for this length of time.

In February 2001, Beckham returned to work. At that time, she requested a change in her work schedule, so that her hours would be 8:00 A.M. to 5:00 P.M., because she was having difficulty obtaining child care prior to 7:30 A.M. Beckham was allowed to change her schedule, and, at that time, her salary was not reduced. No other employee received an exception to the 6:30 A.M. arrival time.

In August 2001, two co-workers reported to Beckham that the manager, Price, had referred to her as a "mother fucking bitch." Beckham reported Price's alleged remark to Paul Harmon, the human resources manager. Harmon immediately spoke with Price. Price then apologized to Beckham, and Beckham does not allege that he made any further derogatory remarks about her.

In October 2001, Beckham discovered that Price was using the CMI credit card to purchase gas for his personal vehicle for his own use and was engaging in other business misconduct. She

2

submitted a formal written report to CMI detailing Price's misuse of the company credit card and company property and his improper discussion of confidential salary information.

On or about April 29, 2002, Price met with Beckham and informed her that she needed to arrive at work at 6:30 A.M. Beckham explained that she could not get to work at that time because her daycare did not open until 7:30 A.M. Price gave her two weeks to make child care arrangements that would allow her to arrive at work at 6:30 A.M.

On May 2, 2002, Beckham again met with Price to discuss her schedule. Price allegedly stated that, "if she were a man, he would not be having this problem." Beckham reported Price's comment to Charlie Ainsworth, district manager, who was in either Baton Rouge or Shreveport at the time. Ainsworth, in turn, reported the comment to Kevin Ruesch, regional manager. Ruesch, Harmon, and Dean Hughes, the sales manager, all came to West Monroe to investigate the allegation.

Ruesch made the decision to demote Price. At the end of the day on May 2, he announced that Price would no longer be branch manager and that Ainsworth would assume Price's responsibilities. Ruesch explained that all employees would be required to assume additional responsibilities because Ainsworth was district manager over other branches.

After Ainsworth took over management of the West Monroe branch, he reported to Ruesch that Beckham was being paid a full-time salary, based on a 45-hour work week, when she was working approximately 32 hours per week because of her later starting time and the fact that she often worked only four days per week.

In late May 2002, Ruesch met with Beckham concerning her poor attendance and work schedule. He gave Beckham two options: (1) working a part-time schedule or (2) working 8:00 A.M. to 5:00 P.M. with a pay cut to reflect the reduction from the 45-hour work week upon which her salary was originally based. Beckham chose the part-time schedule with the same work hours and Fridays

3

off.

After Beckham changed to a part-time schedule, she continued to have attendance problems. In August 2002, Ainsworth gave her the options of adhering to the schedule she had chosen in May 2002 or choosing her day off and being paid on an hourly basis. Beckham decided to elect Mondays as her day off and to be paid on an hourly basis.

In September, Beckham called in sick six days. In October, she called in sick three days. In November, she again called in sick three days.

In November 2002, Ruesch, Ainsworth, Scott Williams, the administrative vice-president, and Angela Donavan, the controller, all attended a branch review meeting. Price was not present at this meeting. Based on the projected and actual sales, they determined that the West Monroe branch was overstaffed. They decided to reduce the number of positions from five to three. Only one inside sales position, one outside sales position, and the truck driver position would remain. Each of the remaining positions would have to be full-time, with a 7 A.M. to 5 P.M. schedule, in order to maintain appropriate customer service. Guy, the outside sales employee, was selected for lay off. Of the inside sales employees, the managers preferred to retain Beckham over Carlson because of her skills. However, the managers needed Beckham to commit to full-time employment.

Following the branch review meeting, Ruesch and Ainsworth met with Beckham and offered her the inside sales position if she could agree to a five-day per week work schedule. Beckham stated that she could not commit to five days per week. Ruesch then offered to allow her to commit to a four-day work schedule, but she would not do that either. Although Ainsworth again asked Beckham to stay, she stated that she did not wish to do so, and her employment was terminated between November

30 and December 2, 2002.[1]

On February 11, 2003, Beckham filed a Charge of Discrimination with the EEOC, alleging that she had been subjected to sexual harassment, sexual discrimination, and retaliation. The EEOC subsequently issued a Notice of Right to Sue, and Beckham timely filed this lawsuit on December 23, 2003.

## II. LAW AND ANALYSIS

### A. Motions for Summary Judgment

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.* The moving party cannot satisfy its initial burden simply by setting forth conclusory statements that the nonmoving party has no evidence to prove its case. *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993).

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party

---

[1] CMI states that Beckham's employment was terminated on November 30, 2002, and Beckham states that she was terminated on December 2, 2002. The precise date of termination has no bearing on this Court's Ruling.

5

to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In evaluating the evidence tendered by the parties, the court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

### B.     Sexual Harassment

Title VII forbids employers to take actions on the basis of sex that "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). Sexual harassment is a form of sex discrimination prohibited under Title VII. *See Meritor Sav. Bank v. Vinson*, 477 U.S. 57 (1986).

To prevail on a sex-based harassment claim alleging hostile work environment, the plaintiff must prove: (1) she belongs to a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on sex; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Green v. Adm'rs. of the Tulane Educ. Fund*, 284 F.3d 642, 655 (5th Cir. 2002) (internal citation omitted). When the harassment is committed by a supervisor with immediate or successively higher authority over the harassment victim, the employee need only prove the first four elements. An employer may raise an affirmative defense by showing that it exercised reasonable care to prevent and promptly correct the harassing behavior and that the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer. *Faragher v. City of Boca Raton*, 524 U.S. 775, 808 (1998).

6

In determining whether a workplace constitutes a hostile work environment, courts should look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.* at 23. Title VII does not prohibit "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Oncale v. Sundowner Offshore Svcs. Inc.*, 523 U.S. 75, 81 (1998). A recurring point in the Supreme Court's hostile environment cases is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Faragher*, 524 U.S. at 788. The standards set forth by the Supreme Court seek to ensure that Title VII does not become a "general civility code." *Oncale*, 523 U.S. at 80. Properly applied, the standards will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788 (quoting B. LINDEMANN & D. KADUE, SEXUAL HARASSMENT IN EMPLOYMENT LAW 172 (1992)). The Supreme Court has made it clear that conduct must be so extreme, so severe and pervasive, as to amount to a change in the terms and conditions of employment. *Id.*

CMI contends that it is entitled to summary judgment on Beckham's claims of sexual harassment because she has not alleged any actions sufficiently severe and pervasive to subject CMI to liability for a sexually hostile work environment.[2] In support of her claim, Beckham relies on the fact that Price called her a "mother fucking bitch" to two of her co-workers. Beckham also contends

---

[2] CMI also contends that it is entitled to summary judgment because Beckham did not report the alleged harassment. The Court need not reach this argument.

that Price discussed his sex life, his step-daughter's sex life, and his wife's fertility problems with her and two of her male co-workers. Beckham identifies the following statements made by Price:

    (1)    Price's thirteen-year-old step-daughter shaved her vagina bald, and his wife made him look at it.

    (2)    Price's step-daughter was having sex.

    (3)    Price's step-daughter was caught having sex in the Prayer Garden at church;

    (4)    Price caught his step-daughter's boyfriend at the house and found a tissue with sperm on it.

    (5)    Price's wife had her period, and he could not have sex with her.

    (6)    Price's wife took a series of injections to help her become pregnant, but if she bled, it was an indication that the injections were not working.

With regard to the comment made about her, Beckham admits that she was not present, Price later apologized, and he never made any other inappropriate comments about her. Beckham does not allege that Price ever made any sexual overtures toward her, or that she was ever physically threatened or humiliated by his comments. With regard to the comments about his wife and step-daughter, Beckham admits that such discussions were rare after October 2001 when she reported his business misconduct, approximately one year prior to her termination.

Considering all the circumstances in this case, Price's remarks do not rise to the required level of severity and pervasiveness to constitute a hostile work environment. *See Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 872-75 (5th Cir. 1999) (over a two-year period, co-worker's statement that plaintiff's elbows were the same color as her nipples, comment on the size of plaintiff's thighs while pretending to look under her desk, and attempt to look down plaintiff's clothing were insufficient to create a hostile work environment); *see also Hockman v. Westward*

*Communs., LLC*, 407 F.3d 317, 326 (5th Cir. 2004) (plaintiff's claims that the alleged harasser (1) once made a remark to her about another employee's body, (2) once slapped her on the behind with a newspaper, (3) "grabbed or brushed" against her breasts and behind, (4) once held her cheeks and tried to kiss her, (5) asked her to come to the office early so that they could be alone, and (6) once stood in the door of the bathroom while she was washing her hands were "perhaps even less egregious than that alleged in *Shepherd*," and, "[a]t best, . . . are on the same plane as those in *Shepherd*. Shepherd's allegations were insufficient in that case [to survive summary judgment,] and Hockman's are insufficient here."). While Price's comments were certainly inappropriate and distasteful, they are not the type of comments sufficient to convert Beckham's workplace into an abusive environment.

Accordingly, CMI's Motion for Summary Judgment on Beckham's sexual harassment claim is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### C. Retaliation

Beckham also alleges that she was subjected to adverse employment actions in retaliation for reporting Price's business misconduct and harassment. In order to state a prima facie case of retaliation, Beckham must show that (1) she engaged in an activity protected by law; (2) an adverse employment action occurred; and (3) there was a causal connection between the participation in the protected activity and the adverse employment action. *See Shackleford v. Deloitte & Touche, LLP*, 190 F.3d 398, 407-408 (5th Cir. 1999). The causal link required by the third prong of the prima facie case does not rise to the level of a "but for" standard. *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002) (citation omitted). If a plaintiff makes a prima facie showing, then "an inference of retaliatory motive" is raised. *Fierros v. Texas Dep't of Health*, 274 F.3d 187, 191 (5th Cir. 2001) (citing *Evans v. City*

*of Houston*, 246 F.3d 344, 354 (5th Cir. 2001)).

To overcome this retaliatory inference, the defendant must produce evidence of a legitimate nonretaliatory purpose for the employment action. *Gee*, 289 F.3d at 345 (citation omitted); *see also Fierros*, 274 F.3d at 191. If the defendant then satisfies its burden of production, the plaintiff must prove that the employer's stated reason for the adverse action was merely a pretext for the real, discriminatory purpose. *Gee*, 289 F.3d at 345.

CMI contends that Beckham cannot make out a prima facie case because she did not engage in a protected activity and also did not suffer an adverse employment action as a result of any protected activity. Even if Beckham ostensibly meets her prima facie burden, CMI contends that it had legitimate, non-retaliatory reasons for all employment actions taken and that Beckham has no evidence that these reasons are a pretext for retaliation.

During her deposition, Beckham asserted that she was terminated in retaliation for submitting a written report of Price's misuse of a company credit card and company property and verbally reporting customer service problems. In her memorandum in opposition to CMI's Motion for Summary Judgment, Beckham also asserts that she was retaliated against for complaining about Price's sexual harassment prior to her termination and points out that she engaged in protected activity by filing an EEOC charge.

To meet the first prong of her prima facie case, Beckham must show that she either (1) "opposed any practice made an unlawful employment practice" by Title VII or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). Beckham cannot meet this first prong on the basis of her complaints about Price's alleged business misconduct. Price's actions, if true, may be inappropriate and unethical, but they are not unlawful employment practices, and any investigation into his actions would not

10

implicate Title VII.[3] Beckham also cannot meet this prong by stating that she filed an EEOC charge. While such activity is protected under Title VII, she did not file an EEOC charge until after her termination.

However, the Court has closely examined Beckham's assertion that she engaged in protected activity by complaining about Price. CMI contends that Beckham "did not complain about sexual harassment at any time during her employment." [Doc. No. 45, at 2]. This contention is not quite true. Although she did not use the words "sexual harassment," there is no dispute, at least not for summary judgment purposes, that Beckham complained to Harmon, the human resources manager, when Price called her a "mother fucking bitch." Although this Court has determined that Price's actions, including this statement, were insufficient to create a sexually hostile work environment, Beckham properly made a complaint to the human resources manager, as provided under CMI's sexual harassment policy, to report a statement which she perceived as harassment. Given the minimal showing necessary to establish a prima facie case, the Court finds that this complaint was sufficient to establish that she engaged in protected activity. *See Green v. Administrators of the Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir.2002) ("Title VII does not require that a plaintiff prove that the conduct opposed was actually in violation of Title VII, but only that a charge was made, or that participation in an investigation of a violation of Title VII occurred.").

Therefore, the Court must further consider whether Beckham made a prima facie showing that her complaint to Harmon resulted in an adverse employment action and whether there was a causal connection between the complaint and the action. Beckham complained to Harmon in August 2001,

---

[3]The Court expresses no opinion as to whether Beckham might have stated a claim under any state or federal whistleblower statute. Beckham asserts only Title VII claims in her Complaint.

11

and, afterward, Price apologized to her and never made any further derogatory remarks. She was not subjected to any change in terms and conditions of employment until nine months later, in May 2002, after Ainsworth began managing the branch and discovered that she was being paid a salary based on a 45-hour work week when she was working an average of 32 hours per week. The Court questions whether any adjustment to Beckham's salary constitutes an adverse employment action when she was working fewer hours than other employees and received the benefit of a schedule she requested. Even if the pay adjustment and schedule change was an adverse employment action, there is no evidence that Ainsworth made the decision on the basis of any improper motive.

There is even less of a connection between Beckham's August 2001 complaint to Harmon and her termination in November or December 2002 **after she was offered the remaining inside sales position**. While Beckham complains in her memorandum that CMI knew she could not work full-time, she has produced no evidence to show a causal connection between her complaint and the turn of events that resulted in layoffs in late 2002. Although a plaintiff's prima facie burden is light, she must have some evidence to support her claims. Under these circumstances, the Court finds that Beckham has failed to meet her prima facie burden.

Accordingly, CMI's Motion for Summary Judgment on Beckham's retaliation claim is GRANTED, and that claim is DISMISSED WITH PREJUDICE.

### D. Gender Discrimination

Finally, Beckham contends that she was subjected to gender discrimination by CMI's actions. In order to make out a prima facie case of gender discrimination, a plaintiff must show that (1) she is a member of a protected class, (2) she was qualified to do the job, (3) she suffered an adverse employment action, and (4) others outside the protected group were treated more favorably than she was. *McDonnell Douglas*, 411 U.S. at 792.

If the plaintiff establishes a prima facie case of discrimination, the defendant must "articulate a legitimate, non-discriminatory reason for its decision." *Rachid v. Jack in The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). If the defendant satisfies this limited burden, "the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive[s] alternative)." *Id.* (internal quotations and citations omitted).

CMI contends that Beckham cannot satisfy her prima facie burden because she was not qualified to perform the inside sales position on a full-time basis, and she has offered no evidence that male employees in the West Monroe branch were treated more favorably. Even if Beckham could satisfy her prima facie burden, CMI contends that she has produced no evidence showing that its reasons for terminating her were pretextual. Beckham has not responded to CMI's arguments regarding her gender discrimination claim except to state that she "was given an ultimatum to stay" and that Ruesch knew when he made the proposal that [she] could not adhere to that guarantee."[4] Doc. No. 42, at 2.

Beckham clearly meets two of the four prongs of her prima facie case: she is a woman, and she suffered an adverse employment action. However, she fails to meet her remaining prima facie burden. First, it is undisputed that Beckham could not or would not work full-time. Thus, after CMI

---

[4]CMI has characterized Beckham's gender discrimination claim as an attack on her termination. Because Beckham has not indicated otherwise, the Court can only assume that she does not attack the reduction in her salary and change in her work schedule as gender discrimination. Even if she had brought such a claim, without further evidence the Court cannot see how a reduction in her salary commiserate with the reduction in hours she requested could be gender discrimination under the facts and circumstances of this case.

determined that one of the two inside sales positions would be eliminated and that the remaining position would be full-time, Beckham, by her own admission, was not qualified for that position because she refused to work a full-time schedule. Beckham was even offered the opportunity to work four days a week and still keep her position, but she refused to work even this more limited schedule. According to CMI, the managers agreed that Beckham was the more valuable employee and could perform the essential functions of the one remaining inside sales position except that she refused to work a full-time schedule. Accordingly, she cannot raise a genuine issue of fact for trial as to whether she was qualified for that full-time position.

Beckham has also failed to produce any evidence that she was treated less favorably than male employees in the reduction in force or in any terms or conditions of her employment with CMI. The evidence shows that Beckham was given a three-month paid maternity leave of absence when no paid leave of absence had ever been given to another employee at the West Monroe branch. After her return to work, she was allowed to change her schedule to a late arrival time when no male employee had ever been provided with this option. Finally, during the reduction in force, the managers selected Beckham over her male co-worker for the one remaining inside sales position. Ruesch and Ainsworth not only offered the remaining position to her, but went so far as to modify the schedule in an attempt to get her to accept the position. Beckham was only terminated after she turned down the position, refusing to commit to a full-time schedule.

Beckham has failed to raise a genuine issue of fact for trial, and CMI is entitled to summary judgment on her gender discrimination claim. Accordingly, that claim is DISMISSED WITH PREJUDICE.

### III. CONCLUSION

For the foregoing reasons, CMI's Motion for Summary Judgment [Doc. No. 31] is

GRANTED, and Beckham's claims are DISMISSED WITH PREJUDICE.

Monroe, Louisiana, this _8_ day of _September_, 2005.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE